**WOMEN EMPLOYED, an Illinois Not-For-Profit Corporation, as agent for and on behalf of Arlene Nagy, one of its members, and Arlene Nagy, Plaintiffs,**

v.

**RINELLA & RINELLA and Samuel A. Rinella, Defendants.**

No. 75 C 702.

United States District Court, N. D. Illinois, E. D.

April 4, 1979.

Peggy A. Hillman, Cotton, Watt, Jones, King & Bowlus, Chicago, Ill., for plaintiffs.

Anna R. Lavin, Edward J. Calihan, Jr. and W. Yale Matheson, Chicago, Ill., for defendants.

## FINDINGS OF FACT and CONCLUSIONS OF LAW

PERRY, Senior District Judge.

This action was tried by the court without a jury. The court has considered the stipulations of the parties, the testimony of witnesses and the documentary evidence, together with the respective contentions of the parties in written, and on oral, argument. Now being fully advised in the premises, the court hereby makes the following findings of fact and conclusions of law:

### Findings of Fact

1. Plaintiff Women Employed is an Illinois not-for-profit corporation. (Final Pretrial Order, Uncontested Fact No. 5).

2. Plaintiff Arlene Nagy is a woman who was employed by defendant Rinella & Rinella from January, 1971, to March 1, 1973, when she resigned, and from October, 1973, when she was rehired, to July 30, 1974, when the association was terminated. (Final Pretrial Order, Uncontested Fact No. 6).

3. Defendant Rinella & Rinella is a law firm practicing law in the City of Chicago and State of Illinois. Samuel A. Rinella is the sole owner of Rinella & Rinella. More than fifteen (15) persons perform services for the firm but less than fifteen (15) of them are lawyers. (Final Pretrial Order, Uncontested Fact No. 3).

4. Plaintiff Arlene Nagy was employed as a legal secretary at the law firm from January, 1971, until her resignation in March, 1973, as a salaried employee. The testimony reveals that Arlene Nagy left her first period of employment with Rinella & Rinella in March 1973 for, among other reasons, she wanted to work on her own and wanted to attend school. During the time she was doing independent work, she came in to see Alice Kotula and indicated her availability for temporary work at Rinella & Rinella. At that time Alice Kotula had authority to hire temporary fill-in help, but her authority did not extend to hiring and firing full-time employees. Arlene Nagy was re-employed at Rinella & Rinella at an hourly rate of $6.25 per hour for hours worked from October, 1973, to July 30, 1974, when she was discharged. The $6.25 hourly rate was the going hourly rate for legal secretaries during that period and it was the rate at which she requested to be paid. She never requested any change in the hourly pay rate. She was permitted to come and go as she chose and to determine the number of hours she worked on any day.

5. The evidence shows that the expected continued employment of Arlene Nagy, at the time of her discharge, was to August 1, 1974, just two days after the day of her discharge. She had returned in October, 1973, to work at Rinella & Rinella for Attorney James Forkins. Attorney Forkins, who was regularly employed as a law professor, was doing some work at the Rinella law firm. His secretary became ill. He learned of Arlene Nagy's availability for temporary work and he testified as to the arrangements for her employment. She came to work for him exclusively and Mr. Forkins testified that such things as paid

vacations and insurance benefits were not discussed with Arlene Nagy. In May, 1974, Attorney Forkins stopped working at the Rinella firm.

Meanwhile, the long-time secretary of Attorney John Rinella (a cousin of Samuel Rinella) had died. He testified that he inquired if Arlene Nagy was going with Attorney Forkins as his secretary and found out she was not. He asked her if she would consider staying on, on the basis that she had been working for Attorney Forkins, until he, John Rinella, went on his vacation in August. He testified he told her that when he would go on vacation, he would have no further need for her, and that when he returned he intended to look for a full-time secretary. Arlene Nagy agreed to stay on upon the same hourly basis as with Attorney Forkins. There was no discussion about her becoming a full-time secretary and about her going on a salaried basis. Although Arlene Nagy testified that John Rinella hired her as his secretary, her testimony is not credible under all the facts and circumstances. This court finds that John Rinella did not hire her as his secretary and that she did not even apply to him or to Samuel Rinella for the position as John Rinella's secretary. Before July 26, 1974, Arlene Nagy well knew that her part-time hourly work at Rinella & Rinella would be over by August 1.

6. It is uncontested that in *The Chicago Daily News* of July 26, 1974, Arlene Nagy alleged that Rinella & Rinella discriminated on the basis of sex in its health insurance benefits. That allegation in the papers reads in its entirety:

> Arlene Nagy, secretary at Rinella & Rinella, said she was refused health coverage because she was covered by her husband's insurance.

(Final Pretrial Order, Uncontested Fact No. 8).

Arlene Nagy had become a member of Women Employed in March, 1974. The evidence shows that Patricia Moore, a feature writer for the *Daily News,* had arranged, through Women Employed to interview various legal secretaries about their jobs for an article. The article appeared on July 26, 1979 under the headline: "Legal secretaries rap their bosses"; and the lead sentence of the article said: "Lawyers are lousy bosses". The article contained four columns of print and photographs of four secretaries. The only reference to Arlene Nagy was the allegation as above set forth in Uncontested Fact No. 8 above. Although several law firms were named in the article, none of the secretaries quoted identified themselves with the law firm for which they worked except Arlene Nagy.

7. On July 30, 1974, Samuel Rinella saw for the first time the July 26, 1974 *Chicago Daily News* article referred to above. (Final Pretrial Order, Uncontested Fact No. 9).

8. It is uncontested that on July 30, 1974, Samuel Rinella demanded that Arlene Nagy retract her statement to the *Daily News* because he stated it was untrue. Arlene Nagy refused, because she stated it was true. (Final Pretrial Order, Uncontested Fact No. 10).

9. The evidence shows Samuel Rinella's demand for a retraction was made during a conversation he had with Arlene Nagy on July 30, 1974; and the court finds from the testimony of Arlene Nagy, Samuel Rinella and other witnesses that the following occurred during that conversation.

After reading the *Daily News,* article, Samuel Rinella went to the desk of Arlene Nagy in the firm's office to ask her for an explanation of her statement and why she would embarrass his firm with that kind of publicity. He asked her if anyone had refused her insurance. She said Alice Kotula had. He told her she was lying and asked her why she didn't come to him with her problems. She told him, "I wouldn't come to you for anything". During the conversation she referred to a conversation she said she had earlier with Alice Kotula concerning insurance. Upon trial Mrs. Nagy testified about this conversation. She said that she asked Alice Kotula, sometime during the first three months of her employment, when she would become eligible for health insurance and that Alice Kotula told her that she had no need for health insurance

since she was married and covered under her husband's policy and that the firm could not provide it. Upon trial, she admitted this was the only time she ever made a request to the Rinella firm for insurance.

When Arlene Nagy made reference to this conversation with Alice Kotula, Samuel Rinella summoned Alice Kotula and repeated Arlene Nagy's claim that Alice Kotula had refused to give Arlene Nagy any hospitalization insurance. Alice Kotula told Arlene Nagy that was not true. Arlene Nagy said it was. To avoid further argument between the two, Samuel Rinella told Alice Kotula to return to her desk. Upon trial, Alice Kotula testified that she never, between January 1 and April 30, 1971, received any inquiry from Arlene Nagy about her insurance coverage under the firm's insurance program and that during that time she did not recall receiving inquiries from anyone else. She said Sidney Gold and Dorothy Schaeffer were in charge of the program at the time and she would have referred inquiries about insurance to them. It was not until in 1972 that she and another employee took over the insurance program. Other witnesses testified that inquiries about and dealings regarding insurance were with Sidney Gold and Dorothy Schaeffer at the time. Alice Kotula testified that at the time she did not know whether Arlene Nagy was married or unmarried and that she knew nothing of her personal life. Based on the testimony, the court finds Alice Kotula had no source of knowledge on which to make the statement attributed to her by Arlene Nagy and that Arlene Nagy's testimony regarding a request for insurance is not believable against the denial of Alice Kotula. Although Arlene Nagy testified she discussed her alleged denial of insurance with several secretaries who worked at Rinella & Rinella at the time, none were called for corroboration.

In the course of Samuel Rinella's conversation with Arlene Nagy on July 30, 1974, he asked her to retract her statement published in the newspaper because it was a lie. He told her she had been fairly treated, allowed to work the hours she chose, and given good pay, and that he found what she had done difficult to believe. She refused to retract the statement about Rinella & Rinella refusing her health coverage.

10. It is uncontested that on July 30, 1974, Samuel Rinella said, "You mean you're not happy here. If you're not happy here, then I want you to pack up and get out". (Final Pretrial Order, Uncontested Fact No. 11).

11. The evidence reveals Arlene Nagy's antipathy to Samuel Rinella. This was evidenced in her testimony. Also, Attorney Forkins, in testifying about her return to work for him, said one of her conditions was that she would not have to work for Samuel Rinella and that during her first period of employment at the firm she had expressed her animosity toward Samuel Rinella. The court finds that Arlene Nagy did not make her published protest in good faith but did so falsely and knowingly out of animosity toward Samuel Rinella.

12. The court finds Samuel Rinella discharged Arlene Nagy in the good faith belief she was lying after he had investigated what, if any, basis she had for making various statements; because of her loud and insubordinate conduct in the firm's working area; because of her disloyalty in holding him up to public opprobrium; and because Arlene Nagy failed to make any effort at retraction. The court further finds Samuel Rinella discharged Mrs. Nagy for cause and non-discriminatory reasons.

13. It is uncontested that on July 30, 1974, just after he told Arlene Nagy to pack up if she was unhappy working in his office, Samuel Rinella went around to each of the secretaries in his office and asked them whether they were happy working in his office; they all said they were happy. (Final Pretrial Order, Uncontested Fact No. 12).

14. It is uncontested that a charge of employment discrimination was filed with the Equal Opportunity Commission by Women Employed "on behalf of Arlene Nagy and other similarly situated women," on August 26, 1974, alleging:

On July 30, 1974, the employer discharged Arlene Nagy for conduct protected under Section 704(a) of Title VII. She was discharged for opposing unfair health coverage at her firm and for membership in Women Employed, an organization committed to ending sex discrimination. The employer has interrogated other employees concerning their affiliation and/or support of Women Employed and has threatened to discharge them if they, too, participated in the organization.

(Final Pretrial Order, Uncontested Fact No. 4). On February 24, 1975, the Commission issued a Notice of Right-To-Sue in this court.

15. There has been no proof adduced that defendant Samuel Rinella, nor defendant Rinella & Rinella, knew of any of the purposes of the organization known as Women Employed prior to, and except for, reading the *Daily News* article referred to in Finding No. 6 above.

16. There has been no proof adduced that defendant Samuel Rinella, nor Rinella & Rinella, knew of Arlene Nagy's membership in, nor her activities in combination with, Women Employed prior to, and except for reading the *Daily News* article referred to in Finding No. 6 above, and particularly between March, 1974 and July 30, 1974. The court finds from the evidence that they did not have such knowledge prior to July 30, 1974.

17. In respect of the Complaint allegation (paragraph 6, Complaint) in July, 1974, that "Arlene Nagy publicly alleged that Defendant discriminated on the basis of sex with respect to terms and conditions of employment," the proof respecting said allegation is the newspaper article referred to in Finding No. 6 above.

18. There has been no proof—and plaintiffs have affirmatively declined to present any proof—that the insurance program existing at Rinella & Rinella was discriminatory, and also stated that defendants need not offer proof that defendants' "policy was

absolutely non-discriminatory and totally lawful".

Plaintiff's counsel has contended that this is a retaliation case under Title VII of the Civil Rights Act of 1964 and that because Arlene Nagy was fired for making a public statement opposing an employment practice, her discharge was retaliatory, and, further, that because Arlene Nagy was fired due to her active membership in Women Employed, her discharge was retaliatory. Plaintiff's counsel has stated in post-trial briefs that the Rinella insurance program "is simply not an issue in this case" and that "the lawsuit does not challenge the discriminatory nature of the Rinella insurance program".

The crux of the complaint is deprivation of insurance benefits. The reference to "employment practice" in the complaint is the insurance program. Plaintiff's counsel has contended defendants discharged Arlene Nagy because she publicly opposed an employment practice and because of her active membership in Women Employed. Since plaintiff's counsel chose not to present proof that the insurance program at Rinella & Rinella was discriminatory, there is lack of proof of a discriminatory employment practice for Arlene Nagy to publicly oppose. Under the circumstances, there should have been a voluntary non-suit by plaintiff's counsel.

19. Plaintiffs have failed to show by a preponderance of the evidence that defendants, or anyone on their behalf, denied any request by Arlene Nagy for insurance, and that she ever requested insurance at any time, and particularly during the early months of 1971.

20. Plaintiffs have failed to show, and the proof shows conclusively, that Arlene Nagy was treated no differently than male members of Rinella & Rinella with respect to participation in the insurance program of the firm.

21. Plaintiffs have failed to show by a preponderance of the evidence facts and circumstances sufficient to generate a be-

lief, founded in reason, that defendants discriminated against Arlene Nagy on the basis of sex.

22. The plaintiff, Women Employed, has failed to identify any "other employees" of Rinella & Rinella, who are members of said organization who have been threatened with discrimination "because of their opposition to practices made unlawful by Title VII, . . .," as alleged in Paragraph 8 of the Complaint.

23. The standing of Women Employed in this action, if any, is derived from its member Arlene Nagy.

24. The acts of plaintiffs after Arlene Nagy's discharge constitute additional good cause on equitable principles, including the doctrine of clean hands, for the rejection of the relief prayed for in plaintiffs' Complaint. The court finds that subsequent to the discharge of Arlene Nagy, and beginning on August 1, 1974, the plaintiffs engaged in a program of harassment, both at the business of Samuel Rinella and at his home, including public ridicule, and efforts to do harm to Samuel Rinella and Rinella & Rinella in their professional relationship with clients and with the Bar, as more specifically hereinafter set forth.

Plaintiffs passed out leaflets in the downtown area saying they had tried to negotiate with Samuel Rinella but that he "had ignored the seriousness of the matter by skipping out to lunch". A group of more than fifty (50) women appeared at the building where Rinella & Rinella has its law offices, mobbed the lobby of the building and interfered with the conduct of business in defendants' law offices. They carried a stuffed figure, representing a human form, with a sign hung around the neck of the effigy on which was written the name of Samuel Rinella. They used the effigy to stage what they called an "interview" with the effigy representing Samuel Rinella.

They went to a national convention of matrimonial lawyers in Chicago during the month of November, 1974, and passed out hundreds of large-sized leaflets. The copy was headed with the following words in large, bold-face type: "Has Sam Rinella tarnished the image of matrimonial lawyers in Chicago?". The copy below stated, in part, that Sam Rinella of Rinella & Rinella "has been widely criticized for his employment practices". (Defendants' Exhibit 139, a copy of which is attached hereto and marked "Exhibit A").

On November 7, 1974, they passed out large-sized leaflets to the neighbors of Samuel Rinella in the neighborhood where Samuel Rinella lives. These leaflets bore the following headline in large, bold-face type: "Good Neighbor Sam is a Bad Employer". (Defendants' Exhibit 39, a copy of which is attached hereto and marked "Exhibit B").

They had a number of women go through the records of the Clerk of the Circuit Court of Cook County systematically searching out the names of plaintiffs and defendants who were represented by Samuel Rinella and his firm and then harassed those clients with derogatory telephone calls and letters about Samuel Rinella.

Plaintiffs filed a complaint with the Chicago Bar Association, which petition was dismissed, being without merit. They filed a complaint against Samuel Rinella before the Attorney Registration and Disciplinary Commission of the Supreme Court of Illinois, which Commission found no misconduct which would merit disciplinary proceedings and voted to dismiss the charge. They filed a complaint before the National Labor Relations Board against Samuel Rinella which was dismissed. For months the plaintiffs continued to harass Samuel Rinella, to invade his privacy, and to damage his reputation as an individual and his professional reputation as a lawyer.

In so doing plaintiffs have not come into this court of equity with clean hands. Plaintiffs have never offered to do equity by retracting the false accusations made by Arlene Nagy in which she stated she had been discriminated against by Samuel Rinella when he denied her health insurance.

## Conclusions of Law

1. The court has jurisdiction of the persons and subject matter herein, under the provisions of Title 42, U.S.C. § 2000e, *et seq.*

■ 2. There has not been shown that defendants, or either of them, engaged in any practice made an unlawful practice under Title VII, and particularly any such practice as respects its insurance program.

3. There has been a failure of proof of any discrimination by the defendants, or either of them, against Arlene Nagy, because Arlene Nagy has opposed any practice made an unlawful practice under Title VII.

4. Plaintiff Arlene Nagy has not been discriminated against by the defendants, or either of them, on the basis of sex, or any other basis made unlawful under the provisions of Title 42, U.S.C. § 2000e, and particularly under § 2000e–3(a), as charged by this Complaint.

■ 5. There was no retaliation against Arlene Nagy as contemplated by Section 704(a) of Title VII, 42 U.S.C. § 2000e(a).

■ 6. Plaintiffs' acts of harassment of defendants after Arlene Nagy's discharge constitute additional good cause on equitable principles for the rejection of the relief prayed for in plaintiffs' Complaint. They who seek equity must do equity and come into a court of equity with clean hands before they can be granted equitable relief.

■ 7. The standing of Women Employed, if any, is derivative of the Complaint of its member, Arlene Nagy.

8. The issues are found in favor of the defendants and against the plaintiffs.

Judgment should be entered in favor of the defendants and against the plaintiffs. A Judgment Order is being entered simultaneously herewith.

[See following illustrations.]