**Anita Kay HARGETT, Plaintiff,**

v.

**DELTA AUTOMOTIVE, INC.,
Defendant.**

**Civ. A. No. 90–AR–0821–NW.**

United States District Court,
N.D. Alabama,
Northwestern Division.

June 21, 1991.

**1488**

Ann K. Norton, James Alan Mendelsohn, Gordon Silberman Wiggins & Childs, Birmingham, Ala., for plaintiff.

H. Thomas Heflin, Jr., Munsey Ford & Heflin, Tuscumbia, Ala., for defendant.

## MEMORANDUM OPINION

ACKER, District Judge.

This action was brought by Anita Kay Hargett against her former employer, Delta Automotive, Inc., claiming a violation of the Pregnancy Discrimination Act which is an amendment to the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e(k), 2000e–2(a)(1). She straightforwardly claims that Delta discharged her because of her pregnancy. Her theory is one of disparate treatment and not of disparate impact. If she has proven by a preponderance of the evidence that her pregnancy was a factor in Delta's decision to fire her, that decision was proscribed by Title VII and will entitle Hargett to back pay with interest and attorney's fees. Although the pre-trial order reflected that Ms. Hargett also sought reinstatement or front pay, she is presently employed elsewhere at a higher rate of compensation, and in her post-trial brief she relinquishes such claims.

Knowing of this court's opinions in *Beesley v. The Hartford Fire Insurance Company*, 717 F.Supp. 781 (N.D.Ala.1989), and 723 F.Supp. 635 (N.D.Ala.1989), *Walton v. Cowin Equipment Co., Inc.*, 733 F.Supp. 327 (N.D.Ala.1990), and *Walker v. Anderson Elec. Connectors*, 736 F.Supp. 253 (N.D.Ala.1990), holding that Title VII litigants are guaranteed a jury trial by the Seventh Amendment, Ms. Hargett exercised what she thought was her right to trial by jury. On an appeal to the Eleventh Circuit from this court in *Cowin Equipment, supra*, the Eleventh Circuit in an unpublished opinion of March 11, 1991, held: "Title VII actions ... are proceedings in equity ...; accordingly, Title VII litigants are not entitled to a trial by jury". This opinion was delivered prior to April 1, 1991, the effective date of 11th Cir.R. 36–2, which now provides:

> *Unpublished Opinions.* Unpublished opinions are not considered binding precedent. They may be cited as persuasive authority, provided that a copy of the unpublished opinion is attached to or incorporated within the brief, petition, motion or response to which such citation is made. A majority of the panel must agree to publish an opinion which was initially issued as an unpublished opinion.

Prior to April 1, 1991, unpublished opinions of the Eleventh Circuit constituted binding precedent. *Harris v. United States*, 769 F.2d 718, 721, n. 1 (11th Cir.1985). Shortly before trial, Delta, learning of the appellate holding in *Cowin Equipment*, filed a motion to strike Ms. Hargett's jury demand. Whether or not 11th Cir.R. 36–2 is retroactive, and thus eliminated *Cowin Equipment* as binding precedent, is an unanswered question. Not waiting for the answer to the question, Ms. Hargett gratuitously withdrew her jury demand, obviating the necessity of a *mea culpa*, although this court readily acknowledges the superior wisdom of the Eleventh Circuit, even though the Supreme Court has not yet revealed its understanding of the Seventh Amendment's impact on Title VII cases. Whether or not the Eleventh Circuit would allow a binding jury verdict in a Title VII case where both parties consent to trial by jury is another unanswered question. If unpublished *Cowin Equipment* is read literally, only an advisory jury can ever be employed in a Title VII case.

Delta agrees that Ms. Hargett successfully accomplished the administrative prerequisites for the filing of her complaint in this court, including her obtaining of a right-to-sue letter from the EEOC, and her timely filing of the complaint.

The evidence on the merits is undisputed that Ms. Hargett was employed by Delta, became pregnant and was fired. These simple undisputed facts create a context in which the court must inquire into Delta's motives for its decision to terminate Ms. Hargett. Another question which must be answered is whether or not any such motive, once ascertained, is proscribed by the Pregnancy Discrimination Act.

Delta did not interpose the so-called *Mt. Healthy* defense, first recognized in *Mt. Healthy City School D. Bd. of Educ. v. Doyle,* 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977). Neither did Delta interpose the illegitimate kin of *Mt. Healthy* known as "unclean hands", a doctrine always available in equity cases such as this one, that is, according to *Cowin Equipment.* Instead, Delta undertook at trial to defend by articulating one or more legitimate business reasons for its firing decision. Delta, of course, argues that its said reasons bear no impermissible relationship to Ms. Hargett's pregnancy. Although Delta does not describe any of its reasons as bona fide occupational qualifications (BFOQ), one of its alleged reasons, hereinafter discussed, could arguably fall into the BFOQ category.

### Findings of Fact

Ms. Hargett was first employed by Delta in 1983 as a telephone salesperson. At all time pertinent Delta has been in the business of rebuilding and selling transmissions and other automotive parts to the secondary market. Its primary sales method is telemarketing. This means that its telephone salespersons solicit past and prospective customers by telephone.

Prior to a divorce which occurred while she was employed by Delta, Ms. Hargett had had two pregnancies, each of which ended in a miscarriage. She suffered no adverse employment action during either of these short pregnancies. In fact, she was considered by Delta to be a valuable and successful salesperson until she became pregnant in 1988 while unwed. The father of her unborn child was one of her customers, with whom she first became involved at a trade show which she attended on behalf of Delta. The customer was married. While having the affair, Ms. Hargett was told by her boyfriend that he was in the process of obtaining a divorce and that he intended to marry her. Armed with this misinformation, Ms. Hargett informed Delta not only of her pregnancy but shared with Delta the name of the customer-father of her unborn child, an unnecessary revelation in light of the fact that it was already common knowledge at Delta that she was seeing the man. The customer then not only figuratively kissed Ms. Hargett goodbye (Ms. Hargett obtains no support for the child from him), but he contemporaneously discontinued doing business with Delta.

Before Ms. Hargett's affair, Benjamin Law, president and owner of Delta, had expressly admonished his female sales personnel to act like "ladies" during trade shows and to act in a "professional" manner. In today's world, such an admonition probably means different things to different people. The court is not absolutely sure what it really meant in this case, because Ms. Hargett continued her affair with her employer's customer after Mr. Law was aware of it. He "counseled" her but he administered no discipline until she became visibly pregnant and until the customer had become a former customer. Other female salespersons had "dated" male customers of Delta without being disciplined, perhaps because there was no written company policy which absolutely prohibited an employee's dating a customer. There was certainly no company rule, written in stone or otherwise, which said: "Thou Shalt Not Commit Adultery". Mr. Law perhaps would have liked to establish such a rule, but if such a rule had been posted on the bulletin board, this action would undoubtedly be framed in terms of disparate impact instead of disparate treatment, even if pregnant unmarried females had not been required to wear a scarlet letter to work.

It goes without saying that an intelligent entrepreneur would oppose any activities by his employee which have the effect of harming the entrepreneur's image and run-

ning off his customers. Prior to pre-trial, Delta's only attempt to justify Ms. Hargett's dismissal was its assertions that she had a poor attitude, that she slept on the job, that her sales declined despite verbal warnings, and that she was warned in writing by the sales manager, C.R. Taylor, that she must produce $31,000 in August sales or be terminated. After her August sales amounted to only $28,114.04, she was terminated on August 30, 1988. The written "termination report" under "reason for separation" said nothing more than "quality of work causing drop in sales".

It was not until the trial began that Delta first attempted to articulate as a legitimate non-discriminatory, non-pregnancy related reason for Ms. Hargett's termination that she had violated an unwritten company rule against unladylike conduct resulting in a customer loss. In defending Ms. Hargett's charge before the EEOC, Delta had never mentioned or even suggested such a reason.[1] For aught appearing, Delta never informed the EEOC that Ms. Hargett had had an affair with a customer who, after Ms. Hargett became pregnant by him, discontinued doing business with Delta. At no time did Delta defend before the EEOC on the basis of an alleged BFOQ against adultery and/or unladylike conduct.

Ms. Hargett readily admitted that her pregnancy caused her nausea and fatigue, as a result of which her treating physician recommended rest breaks, including naps, during working hours. As would be obvious, her napping had some adverse effect on her sales. Obviously this shortcoming was pregnancy related. It did create some jealousy in her non-napping fellow workers. Although her sales figures reflect that the quality of her work did not decline appreciably during her pregnancy, Delta's witnesses criticized Ms. Hargett's "attitude", describing her as complacent and nonaggressive. Feeling nauseous can, of course, slow a person down.

A crucial piece of evidence was a written exhibit which purports to be a formal written warning dated July 26, 1988, from Mr. Taylor to Ms. Hargett, saying that unless she met a sales quota of $31,000 in August she would be terminated. There are several very interesting things about this document. First, Ms. Hargett categorically denied that she received any such admonition from Mr. Taylor, either written or verbal. Second, the warning form contains a space on which the employee is supposed to acknowledge its receipt. It also has a space for the employee's comment. Ms. Hargett's signature and handwriting nowhere appear on the document. Third,

---

1. Plaintiff's Exhibit 12.
March 6, 1989
EEOC
2121 8th Avenue North
Birmingham, AL 35203
REF: Charge #130–89–0754 Anita K. Hargett
Dear Mr. Todd:

Delta Automotive, Inc., is a telemarketing company and the value of each customer is very important. Having been an employee for over three years Anita Hargett was well aware of customer value to Delta. At the time of dismissal Anita Hargett's accounts were valued at a minimum of $40,000.00 a month.

Deterioration in Anita Hargett's attitude as evidence by sleeping on the job, reading magazines and blocking her phone so that no calls could be put through, led to her dismissal. In an effort to motivate her a cash bonus was offered. When this did not work she was given an ultimatum, produce $31,000 in sales for August or be terminated.

Listed below are key points which substantuate [sic] the dismissal of Anita Hargett along with documented copies.

1. I gave Anita K. Hargett several verbal warnings on her declining sales.
2. On July 26, 1988 she was given a written warning stating she must produce $31,000 for August sales or be terminated.
3. I received a letter from her doctor, dated August 23, 1988, containing special requirements during her pregnancy. Delta Automotive, Inc. met the doctor's requirements.
4. A copy of her August sales, $28,114.04 is enclosed.
5. There as a total of 5 pregnancies in 1988 and none were terminated from Delta Automotive, Inc.
6. A copy of Anita Hargett's unemployment claim form showing unsatisfactory work as her reason for discharge.
7. Pages from the Delta Automotive, Inc. Handbook.

Sincerely,
/s/C.R. Taylor
C.R. Taylor, Sales Mgr.

Delta produced no written warning ever delivered to any other employee and not acknowledged in writing by that employee. Fourth, Delta offered no proof that any other salesperson in Delta's history had ever been required to meet a particular quota upon penalty of termination. Fifth, Mr. Taylor himself was fired after Ms. Hargett was fired and did not appear as a witness. In other words, Ms. Hargett's denial of having received any such warning was never contradicted by any sworn testimony. Last but not least, the court recognized that the purported signature of Mr. Taylor on the warning and the purported signature of Mr. Taylor on Plaintiff's Exhibit 12 (the letter-defense offered to the EEOC), although *almost* identical, had sufficient variations and differing characteristics to convince the court that at least one of them was a forgery. At the conclusion of the evidence, the court granted Delta two weeks within which to challenge the court's tentative conclusion that Plaintiff's Exhibit 12 contained a forged signature of Mr. Taylor. On May 30, 1991, Delta filed the affidavit of Mr. Law, in which he admitted having signed Mr. Taylor's signature to the EEOC letter. This admission did little for Delta's over-all credibility, and forces the conclusion that the "scattergun" reasons set forth by Delta for Ms. Hargett's discharge set forth in the EEOC letter were either exaggerations, or concoctions designed to mask the true reason or reasons never shared with the EEOC. Because both Ms. Hargett and other female employees had dated Delta customers contrary to the alleged company policy against fraternization with customers, and no one had ever been disciplined for such activity until Ms. Hargett was fired, the only difference between her case and others who fraternized was her unwed pregnancy as a result of the open affair. It was not until Ms. Hargett became pregnant and lost the customer that she was terminated. The termination decision had a moral dimension as well as a business dimension, but both dimensions necessarily were connected, either directly or indirectly, with the fact of her pregnancy. If the decision to fire her had been because of her poor attitude, as claimed by Delta's witnesses, she would have been fired long before her unwed pregnancy was caused by her liaison with a customer who then disappeared.

By stipulation, the parties have agreed that Ms. Hargett's lost wages, plus interest, amounts to $12,912.16. Although there admittedly was a small loss of other benefits, such as insurance, that loss was never quantified, and a finding as to the amount would amount to speculation.

### Conclusions of Law

As conceded by the parties, the court has jurisdiction pursuant to 28 U.S.C. §§ 1331, 1343(a)(4), 2201 and 2202, and 42 U.S.C. §§ 2000e, *et seq.*

This court's job is not to try to guess what a jury would have done with this case, although the case certainly would have made a good one for jury resolution, inasmuch as credibility determinations are so important to the outcome. Who wins depends almost entirely on who is the more believable. In Volume 15, Number 2, LAW AND HUMAN BEHAVIOR, a special issue devoted to "Social Science and the U.S. Constitution", April, 1991, at p. 165, appears an article entitled "Changing View of Jury Power" by Irvin Horowitz of the Department of Psychology, University of Toledo, and Thomas E. Willging of the Federal Judicial Center. After outlining their empirical research into the competence of juries in both civil and criminal trials, the two authors concluded:

> Efforts to control the power of juries rest on often unspoken assumptions concerning the lack of predictability and rationality juries exhibit (Selvin & Picus, 1987). These assumptions include the notion that juries have a predisposition to decide cases on an emotional basis, swayed by the plights of individual parties. The corollary, which is essential to the proposition that "runaway" juries need to have their power limited sharply, is that judges are more likely to decide cases on principled rational grounds. This point of view holds that the legal specialist, the judge, can produce more accurate outcomes than groups of nonspecialists. It is also assumed that the complex nature of modern tort litiga-

tions renders the civil jury incapable of fair and rational decision making.

There is an alternative theme that has a fundamentally different premise. This premise holds that juries have demonstrated an historical competence at applying common sense notions of equity to conflicted, ambiguous situations.

*Id.*, p. 180.

Ms. Hargett's case is surely made up of "conflicted, ambiguous situations" and certainly calls for the application of the "common sense" solution that judges, including this judge, are not as good at as juries are. Judges, of course, take their responsibilities seriously, but they sometimes are overawed by the arcane rules of law with which they must deal. For instance, in this case, which the Eleventh Circuit has determined to be a suit "in equity" and thus exempted from the mandate of the Seventh Amendment, an inevitably available defensive device, as pointed out earlier, is the classic principle of equity jurisprudence that "one who comes into equity must come with clean hands", and that persons are barred if they themselves are guilty of improper conduct in the matters as to which they seek relief. *Precision Instrument Mfg. Co. v. Automotive Maintenance Machinery Co.*, 324 U.S. 806, 65 S.Ct. 993, 89 L.Ed. 1381 (1945). Assuming with the Eleventh Circuit, as other federal courts have done, that all Title VII cases are equitable in nature, those other courts logically have recognized the doctrine of "unclean hands". In *Women Employed v. Rinella & Rinella*, 468 F.Supp. 1123 (N.D.Ill.1979), the district court employed the referenced maxim to deny a female legal secretary relief on her claim of sexual harassment because she had engaged in counterharassment after her discharge and during the processing of her claim. This fact could not have been articulated as a reason for what the employer did, because it did not occur until after the adverse employment action. In *Carpenter v. Ford Motor Co.*, 761 F.Supp. 62 (N.D.Ill.1991), the same district court more recently and more fully discussed the "unclean hands" defense in a gender-based Title VII case. The court there said:

[T]he plaintiff moves to strike the defendants' second affirmative defense of "unclean hands" as inapplicable to Title VII claims as a matter of law. Plaintiff points out that in a Title VII cause of action, absent direct evidence of a discriminatory animus, the plaintiff must establish a prima facie case, then the burden shifts to the employer to articulate some legitimate, nondiscriminatory reason for its actions. Once the employer meet her burden, the plaintiff is afforded the opportunity to show that the employer's stated reason was pretextual. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 805, 93 S.Ct. 1817, 1825, 36 L.Ed.2d 668 (1973). From this the plaintiff reasons that the affirmative defense of "unclean hands" is inappropriate for all Title VII claims. Indeed, the Seventh Circuit has found that "equitable defenses such as unclean hands may also have more limited play in free-speech cases" and other first amendment cases. *Shondel v. McDermott*, 775 F.2d 859, 869 (7th Cir.1985). However, the Court did not go so far as to say that the doctrine of "unclean hands" should never be allowed as an affirmative defense in Title VII suits. Moreover, at least one court in this circuit has applied the doctrine of unclean hands to bar a plaintiff's Title VII claim. *Women Employed v. Rinella & Rinella*, 468 F.Supp. 1123, 1128 (N.D. Ill.1979) (plaintiff denied equitable relief from sexual discrimination claim where, following her termination, she embarked on a program to harass and embarrass her former employer). Accordingly, we will not strike the defendants' defense of "unclean hands" as inapplicable to Title VII claims.

761 F.Supp. at 66.

Not dissimilar is *Summers v. State Farm Mutual Auto. Ins. Co.*, 864 F.2d 700 (10th Cir.1988), in which the Tenth Circuit allowed an employer to offer as a defense information which it did not find until preparation for trial. Obviously it could not have articulated what it did not know as a reason for the complained-of discharge. In that case the plaintiff had falsified her original application for employment, a fact not discovered until discovery. Interest-

ingly, the Eleventh Circuit has recently taken the *Summers* issue for review under a certification for interlocutory appeal in a Title VII case pursuant to 28 U.S.C. § 1292(b).

Title VII cases being equity cases according to the Eleventh Circuit, two questions quickly arise: (1) Did Ms. Hargett come to this court of "equity" with "clean hands"?; and (2) if not, can the "unclean hands" defense be interposed inasmuch as it was not affirmatively raised by Delta? Answering the second question first, this court can fully understand why Delta would not interpose a defense not recognized at law when at the pre-trial conference and up until shortly before trial, this court was preparing to try the case to a jury. It would be unfair in the extreme not to permit the introduction of an equitable defense only prompted by the recent Eleventh Circuit's ruling in *Cowin Equipment* holding that Title VII cases are "equitable". The pre-trial order is therefore deemed amended to allow Delta to claim "unclean hands" as a defense.

■ The first question is a harder one: Has Ms. Hargett done anything to make her hands so unclean that she should be denied access to this court of equity? This court finds that her hands are only smudged. First, while courts of equity in a much earlier age of their evolution acted from time to time as a moral judge, this court is unable to find anything in what Ms. Hargett did which in today's world should be described as giving her "unclean hands". Whatever Ms. Hargett may have done is not so lacking in rectitude as to close the doors of a court of equity to her, particularly when what she did, and its resulting loss of a customer, all took place prior to her discharge and would have to be factored into the routine Title VII proof analysis, either in the *McDonnell–Burdine* mode or in the *Mt. Healthy* mode. If Delta thought that Ms. Hargett should be barred from equity because of immorality, it waited a long time to say so and has only said so in a very oblique fashion. Although Delta did articulate believably a business philosophy requiring its female employees to be "professional" and "ladylike", and certainly had a legitimate interest in its "image", this court cannot equate Delta in this regard with the Y.W.C.A., which in *Harvey v. Young Women's Christian Ass'n*, 533 F.Supp. 949 (W.D.N.C.1982), was found justified in terminating an unwed, pregnant counselor for the reason that she failed to reflect the employer's high purpose and philosophy.

■ In its post-trial brief, Delta argues that Ms. Hargett failed even to make out a prima facie case. Delta attempts to employ the *McDonnell–Burdine* analysis for a disparate treatment case, saying that plaintiff must prove (1) that she is a member of a protected class; (2) that she was qualified for the position she held; (3) that she was fired; and (4) that she was replaced by a person outside the protected class. Delta admits "that the plaintiff was a female; was pregnant; and had the necessary qualifications to be a salesperson for Delta". Delta pegs its defense on the fact that there was "no evidence that she [Ms. Hargett] was replaced by a person outside of the protected class", namely, by a non-pregnant person. The court cannot agree with Delta that in a pregnancy discrimination case a discharged plaintiff fails to make out a prima facie case if she cannot show that she was replaced by a non-pregnant person. The traditional *McDonnell–Burdine* formula breaks down when one attempts to apply it to a pregnancy termination case in which the Pregnancy Discrimination Act provides that any adverse action based on an employee's pregnancy constitutes a *per se* violation, whether plaintiff is replaced or not. *Hayes v. Shelby Memorial Hosp.*, 546 F.Supp. 259 (N.D.Ala.1982), *aff'd* 726 F.2d 1543, *rehearing den'd*, 732 F.2d 944 (11th Cir.1984). In other words, if pregnancy plays any role whatsoever in the adverse employment decision, the legislative intent was to prevent it. This all-embracing principle was brought clearly to the attention of employers in *International Union UAW v. Johnson Controls*, —— U.S. ——, 111 S.Ct. 1196, 113 L.Ed.2d 158 (1991), in which the Supreme Court recently found that a work rule forbidding potentially pregnant women from being assigned to places at which

injury could be caused to their unborn babies was not a legitimate BFOQ. According to *Johnson Controls*, Congress has put firmly in place a public policy giving fertile women a substantial degree of extra protection against any form of adverse treatment in the work place, no matter who else may be hurt.

■ The court cannot really know all of the factors which motivated Delta to terminate Ms. Hargett or which of those factors predominated. This court does find that the alleged legitimate, non-pregnancy reasons for the termination, as articulated by Delta, cannot insulate Delta from the effect of the predominating fact that Ms. Hargett's pregnancy was inextricably a factor in the decision. It is perhaps unnecessary in this case to find Delta's articulated reasons pretextual in the sense of being totally dishonest or insincere, although the forged signature on the letter to the EEOC does bear a striking resemblance to a smoking gun, and although the August sales quota threat was either a before-the-fact "set up" or an after-the-fact invention. In either event it was a pretext. The only ultimate fact necessary for a decision in favor of Ms. Hargett, the decision which this court will separately enter, is that her pregnancy constituted a part of the motivation for the decision to terminate her.

### ORDER

In accordance with the accompanying memorandum opinion, plaintiff, Anita Kay Hargett, shall have and recover of defendant, Delta Automotive, Inc., the sum of $12,912.16, and no other relief except such attorney's fees and expenses as may be awarded.