John M. WOODS, Plaintiff,

v.

Victor B. FICKER, et al., Defendants.

Civ. A. No. 90–AR–0729–M.

United States District Court,
N.D. Alabama,
Middle Division.

July 17, 1991.

Cleophus Thomas, Jr., Reid & Thomas, Anniston, Ala., for plaintiff.

R. Larry Bradford, Joseph Allen Schreiber, Lloyd Bradford Schreiber & Gray, P.C., Birmingham, Ala., R. Kent Henslee, Henslee Bradley & Robertson, P.C., Gadsden, Ala., Edward M. George, Alabama Dept. of Postsecondary Educ., Montgomery, Ala., Jeffery A. Foshee, Montgomery, Ala., for defendants.

Solomon S. Seay, Jr., Montgomery, Ala., Julius L. Chambers, Norman J. Chachkin, New York City, Janell M. Byrd, NAACP Legal Defense & Educational Fund Inc., Washington, D.C., for Anthony T. Lee.

## MEMORANDUM OPINION

ACKER, District Judge.

John M. Woods, plaintiff in the above-entitled cause, invokes Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 1981 and the prior decrees entered in *Lee v. Macon*, CV 70-0251-S, especially the decree entered on December 13, 1985, in which this court consolidated Alabama Technical College, Gadsden State Technical Institute, and Gadsden State Junior College, all located in Etowah County, Alabama, thereby creating Gadsden State Community College. Mr. Woods, who is black, sues Victor B. Ficker, President of Gadsden State, and Fred J. Gainous, Chancellor of Postsecondary Education in Alabama. As Chancellor, Dr. Gainous is the person to whom Dr. Ficker and all other presidents of Alabama's postsecondary two-year institutions are directly answerable. Originally the individual members of the Alabama Board of Education were also defendants, but their motion for summary judgment was granted earlier because they, in their individual capacities, had not been involved in the decisions here under attack.

Both Drs. Ficker and Gainous are sued as individuals and not in their official capacities. Mr. Woods does not invoke 42 U.S.C. § 1983, although whatever the two defendants did was obviously done under color of state law. Neither the complaint nor the pre-trial order charges defendants with contempt. In fact this court on June 1, 1990, expressly denied Mr. Woods' petition for intervention in *Lee v. Macon* but gave him the right to rely upon any orders in *Lee v. Macon* which might give him rights not duplicative of his statutory rights. Mr. Woods seeks declaratory and injunctive relief in the form of instatement in the position as Campus Director at Gadsden State's "technical campus" at East Broad Street, back pay and the seniority date he would have received had he been named Campus Director when the position was awarded to Don Jarrells, who is white, and the salary increased. Mr. Woods also seeks one million dollars in punitive damages under § 1981. In his post-trial brief, Mr. Woods, for the first time, asks that defendants be found in contempt. There was never any mention of contempt at trial, and no order to show cause was ever addressed to defendants.

Mr. Woods claims that Drs. Ficker and Gainous failed to advertise the position of Campus Director before filling it and that this failure not only constituted a violation of *Lee v. Macon* but was motivated by race, thus constituting a violation of Title VII and of § 1981. Defendants concede that this particular claim under § 1981 is not defeated by *Patterson v. McLean*

*Credit Union,* 491 U.S. 164, 109 S.Ct. 2363, 105 L.Ed.2d 132 (1989), but they deny that they violated Title VII, or § 1981, or any decree in *Lee v. Macon.* They further assert affirmative defenses, particularly the *Mt. Healthy* defense, saying that even if the position of Campus Director had been advertised and Mr. Woods had been interviewed, Mr. Woods would not have been chosen because, assuming *arguendo* that Mr. Woods was qualified for the position, Mr. Jarrells was better qualified and would have been appointed.

## FINDINGS OF FACT

To no avail the court begged the parties to request the jury trial to which they would unquestionably have been entitled in a § 1981 case pursuant to *Lincoln v.*

*Board of Regents of Univ. System,* 697 F.2d 928 (11th Cir.1983); *Setser v. Novack Inv. Co.,* 638 F.2d 1137 (8th Cir.1981), *cert. denied,* 454 U.S. 1064, 102 S.Ct. 615, 70 L.Ed.2d 601 (1981) (from which three justices dissented); and *Redd v. Phenix City,* 934 F.2d 1211 (11th Cir.1991). *See also,* "Right of Jury Trial in Suits for Back Pay: Title VII or Section 1981", 12 Memp.St. U.L.Rev. 355 (1982). Wisely or unwisely, the parties chose to leave the fact-finding to the court.

At the request of the parties, the court first takes judicial notice of all pertinent decrees previously entered in the seminal case, *Lee v. Macon,* in particular the memorandum opinion and decree of this court of December 12, 1985, which created Gadsden State.[1] The court also takes notice of the

### 1.  MEMORANDUM OPINION

The court has for consideration the petition of Charles L. Payne, Chancellor of Postsecondary Education, filed on July 31, 1985, for authorization to implement a plan for consolidating Alabama Technical College, Gadsden State Technical Institute (the Institute) and Gadsden State Junior College. The petition was initially set for hearing on August 23, 1985, but the United States, plaintiff-intervenor and amicus curiae, moved for a continuance in order to give it more time to evaluate and to respond to the proposed plan, whereupon the court on August 23, 1985, granted an extension and ordered that all affected parties file their responses or objections on or before October 24, 1985. On October 24, 1985, the United States filed its response, interposing no objection to the proposed plan, with certain limited reservations. If the court had taken the matter under submission on October 24, 1985, it immediately could have approved or disapproved the proposed plan, with or without reservations or changes. Instead, on November 1, 1985, the court set the entire matter for oral hearing on November 27, 1985, so that the court could hear from the petitioner and ask questions. Then, on November 6, 1985, the original plaintiffs filed a belated response denying the material averments of the Chancellor's petition and objecting to his proposal. On November 7, 1985, the Chancellor filed a motion to strike plaintiffs' belated response. November 27, 1985, the court conducted a hearing both on the Chancellor's petition and on his motion to strike.

Although the Chancellor's motion to strike the untimely response of plaintiffs is well taken, the purpose of the hearing on November 27, 1985, was to assure the court that the Chancellor could meet his burden of proving the material averments of his petition. Therefore, the denial by plaintiffs, whether timely or untimely, did no

more than to keep the burden of proof where it belonged. The Chancellor's motion to strike will be denied.

Although the court is not controlled by the fact that the United States happens to be in agreement with the Chancellor's proposal, the court is impressed with the sincerity and care with which the United States seems to have evaluated the proposal. Also the court readily acknowledges with plaintiffs' counsel the difficulty, if not the impossibility, of accomplishing an economically viable and unitary system of post-secondary education while respecting the strongly held feelings of each separate institution, its faculty and its student body. However, if the proposed findings and conclusions submitted by plaintiffs' counsel were adopted by the court, it would not only prolong and delay the accomplishment of a unitary system for post-secondary education in the Gadsden area but might also indicate that plaintiffs' counsel during past years has failed to monitor officialdom's compliance with the former decrees of this court entered in this case insofar as these three institutions are concerned, and might indicate that plaintiffs should have been the movants instead of the objectors. The proposed findings and conclusions submitted by the Chancellor and concurred in by the United States, in the court's view, more nearly reflect the true state of current affairs and present an appropriate method for administering the three affected institutions. In large part it will hereinafter be employed by the court.

The Chancellor claims that consolidation of the three post-secondary institutions in the Gadsden area is necessary for the following reasons: (1) in order to maintain and to improve the financial condition of the three institutions; (2) in order to effectively and efficiently provide quality educational services responsive to the needs and demands of persons in the

area; and (3) because it will not impede desegregation but rather will have a positive impact upon black employees and students of all three institutions. Plaintiffs seem to prefer that the Institute remain a separate institution not subject to consolidation and argue that the Chancellor's proposal is no more than a continuation of discrimination toward the Institute.

Upon consideration of the evidence the court makes the following findings of fact:

1. The Chancellor's proposal will result in a community college having a single centralized administration while maintaining three desegregated campuses. This may not be a perfect solution to a difficult and nagging problem but it constitutes a needed and large step toward the effectuation of a unitary system.

2. Over the past several years (especially since the academic year 1980–1981) all three institutions have experienced serious declines in enrollment. Because the funding of post-secondary institutions by the State of Alabama is largely based on enrollment these declines will adversely impact on the financial condition of all three institutions unless substantial corrective measures are taken soon.

3. Serious difficulties have existed and still exist at all three institutions. The seriousness of these difficulties is illustrated by the comments of the "Administrative and Programmatic Task Force: Gadsden and Etowah County", in its report of August, 1984, where at page 24 the Task Force correctly concludes: "At the present time, Gadsden State Technical Institute's funding level will not support its existence as a separate entity".

4. With respect to appropriations, the Institute receives the highest funding per student of any of the State's 28 technical colleges or divisions. For 1984–85 the Institute received an appropriation from the State of $4,597.72 per full-time equivalent student, as compared to a State average of $3,183.63.

5. The Chancellor is justified by financial considerations alone in his proposal to consolidate the three Gadsden schools as a means of facing the economic "facts of life" which will not disappear even under the wand of a federal judge. In reality the Chancellor seeks to preserve the Institute as a viable, desegregated campus of a consolidated college. Another realistic alternative would be simply to close one of the three, to eliminate its campus, and to transfer its students and faculty to the other two institutions, but the Chancellor and the United States apparently wish to recognize the continued place for the Institute's campus, buildings and people even though it is the smallest of the three.

6. Consolidation will better provide for efficient and effective delivery of educational services including academic programs, support services, and student services.

7. Consolidation will not impede desegregation. A consolidated community college will have a projected minority population of 20.74%, as compared to a minority population of 10% among the counties in the junior colleges' present service area. Further, the Chancellor's transitional plan will result in no dismissals or demotions of black employees, while 1.5% of white employees will be demoted. Although 5.8% of the white employees will be promoted during the transition, 11.5% of the black employees will be promoted. Rather than impeding desegregation, the consolidation plan is fair with respect to minority employees and preserves the Institute in the only way it can be preserved as a practical matter.

8. Plaintiffs have offered no credible evidence to support their contention that the Chancellor's proposal is no more than a continuation of discrimination against the Institute. At no time since October, 1970, have Alabama Technical College and the Institute concurrently offered the same academic programs. In this respect all three institutions have complied with the order of August 17, 1970, to eliminate duplication. Moreover, in light of the evidence and of the court's findings in paragraph 3 through 7 above, the court cannot conclude that any discriminatory intent inheres in the proposed plan. Even if the court had been presented with evidence from which it could infer a past discriminatory intent, there is no evidence from which the court can legitimately infer that the proposed plan intends to discriminate against the Institute in particular or against blacks in general. Mere allegations of past discrimination should not prevent the Chancellor from consolidating the three schools in order to strengthen all three campuses.

Based on these findings of fact, the court reaches the following conclusions of law:

1. The proposed plan is educationally sound and substantially dictated by principles of good fiscal management as well as administrative good sense.

2. The proposed plan does not impede desegregation but rather speeds it. The plaintiffs' "schizophrenia", however understandable as a matter of pride and of history, cannot stand the way of the final accomplishment of a truly integrated system of higher education in Alabama.

3. The proposed plan is not a continuation of any past discrimination but rather constitutes a bona fide effort to achieve a unitary system without any vestiges of racial discrimination.

An appropriate separate order will be entered.

DONE this 12th day of December, 1985.

/s/ William M. Acker, Jr.
WILLIAM M. ACKER, JR.
UNITED STATES DISTRICT JUDGE

ORDER

In accordance with the accompanying Memorandum Opinion it is

ORDERED, ADJUDGED and DECREED by the court as follows:

1. The Chancellor and President of the consolidated community college, composed of the campus, faculties and students described in the Chancellor's plan, are AUTHORIZED to take any and all steps reasonably necessary to imple-

memorandum opinion and decree in *Gladys Burns v. Gadsden State Community College*, 766 F.Supp. 1049 (N.D.Ala.1991), which will be referred to *infra*. Lastly, the court takes judicial notice of *Whitaker v. Ficker, et al.*, CV 90–AR–1809–M, a case which is still pending in this court. In *Whitaker*, the plaintiff is white, but his contentions are virtually identical with the contentions here made by Mr. Woods, namely, that this particular position of Campus Director was improperly enhanced so as, in effect, to create a new position which in fairness and in alleged compliance with *Lee v. Macon* should have been advertised. Drs. Ficker and Gainous earlier moved to consolidate Mr. Whitaker's case with Mr. Woods' case. This court declined, deciding to look at Mr. Woods' and Mr. Whitaker's claims separately. As it has turned out, the court may have done nobody, including itself, a favor by not hearing these two contradictory but connected claims together.

Dr. Gainous, who is black, has very impressive academic credentials and has an outstanding background in public school administration. As the person to whom the presidents of all of Alabama's community colleges and technical schools answer, Dr. Gainous understandably does what he can to avoid active involvement in the day-to-day management and personnel matters at the numerous institutions over which he has overall supervision. He readily acknowledges that as a *general rule* new job opportunities at all of the postsecondary schools should be "posted" or advertised in order to create a climate of fairness and a uniform process by which to select the best qualified applicants. He fully recognizes the existence and binding effect of *Lee v. Macon*, including the order which this court signed on December 12, 1985, creating Gadsden State. In spite of this concession that such a general rule exists, Dr. Gainous argues persuasively that occasionally circumstances arise which justify a deviation from the general rule. In this particular fact situation, he says that if there was a deviation, the deviation was justified by circumstances which rendered fair and equitable a decision which otherwise might appear inequitable. Dr. Gainous' consciousness of, and sensitivity to, race, and his comprehension of the past injustices suffered by blacks in Alabama's school system, is constrained and tempered by his present responsibility as an administrator. He is practical and pragmatic as well as responsive to the obligations imposed upon him by law.

After the merger of the three schools in 1985, the three separate campuses did not miraculously merge geographically. As powerful as federal judges are, the merger decree could not wipe out the fact that there were three separate campus sites. In September, 1988, Dr. Ficker was eventually named President of the new, consolidated Gadsden State. He inherited Mr. Jarrells as Campus Director at the East Broad campus. Mr. Jarrells assumed the duties of Campus Director in October, 1987, under the previous President. Dr. Ficker's first and most crucial task upon arrival was to reorganize the administration, faculty, and student body in a way that would both comply with the merger

ment the consolidation of the three post-secondary institutions named in the petition, including but not limited to the implementation of the three-phase plan for consolidation as described in the Resolution of the Alabama State Board of Education adopted at its meeting of February 28, 1985, and the Chancellor's transitional plan for consolidated as described in "Attachment A" to his petition. The court specifically APPROVES and RATIFIES each proposed change in status of personnel as listed and described in Exhibits 47 through 53 of said "Attachment A".

2. The Chancellor and President shall hereinafter operate the community college as a single institution in which the racial composition of the faculty, the staff and the student body shall not indicate or suggest that any particular campus is intended for students of only one race. In all dealings with the public the euphemistic expressions "predominantly white" and "predominantly black" shall be avoided like the plague.

3. The Alabama State Board of Education shall continue to provide to this court and to the parties separate annual reports as to the racial composition of the faculty and the student enrollment at each of the three campuses of the consolidated community college.

DONE this 12th day of December, 1985.

/s/ William M. Acker, Jr.
WILLIAM M. ACKER, JR.
UNITED STATES DISTRICT JUDGE

decree and be workable. This was no mean task, as is clearly proven by the testimony of David Tipton, Gadsden State's Academic Director of Social Sciences, who, on September 5, 1990, wrote a letter to Dr. Ficker highly criticizing the organizational scheme which Dr. Ficker inherited and which appeared to Dr. Tipton to have created unnecessary and duplicative positions. Dr. Tipton was called as a witness by Mr. Woods. Dr. Ficker appointed a Reorganization Committee within a month after he arrived. Dr. Tipton's understood complaints were of the kind which go along with every complex judicial desegregation effort.

Although there were several instances of the filling of non-academic jobs without posting or competitive bidding after Dr. Ficker became President, the court heard no convincing evidence to prove a pattern or practice of taking procedural shortcuts for the purpose of preferring whites over blacks in the filling of positions. The dispute here is limited to the upgrading of the position of Campus Director at the so-called "technical campus" at East Broad Street.

After the 1985 merger, Mr. Woods held several positions at the newly formed Gadsden State. Under President Robert Howard, who preceded Dr. Ficker, Mr. Woods held the title Administrative Assistant to the President. Mr. Woods' post-trial brief argues that after 1985 Mr. Woods was "demoted and holds an inferior position to the position he held at the time of the consolidation". If so, he waited a long time to complain about it. Under Dr. Ficker's plan of reorganization, Mr. Woods became Personnel Officer and Director of Title III Programs. He was named to this position without posting or bidding or any competitive process, but simply as part of the plan of reorganization about which Dr. Tipton complains. Prior to the publication of the organizational chart or scheme, Mr. Jarrells who is white, and who, like Mr. Woods, has a master's degree, held the title Assistant to the Technical Dean, a position awarded him after posting. This position placed duties upon Mr. Jarrells at all three campuses but, as a practical matter, his predominant responsibility was at the "technical campus" where the technical and vocational classes were taught. The organizational chart reflected the position entitled Campus Director at each of the three campuses, although the "technical campus" had no actual Campus Director until Mr. Jarrells was named to the position without any posting or competitive process. Mr. Jarrells' salary, which at the time of his being named Campus Director was the same as that of Mr. Woods, was not changed at the time he received his new title. His duties did not change. When Mr. Jarrells' title was changed to Campus Director, nobody, including Mr. Woods, protested or complained. Mr. Woods understandably did not seek the job.

Long after Mr. Jarrells became Campus Director at the "technical campus", Dr. Ficker recognized that the other two Campus Directors were in a higher salary range than the third Campus Director, Mr. Jarrells. Without posting the job as a new or higher paying position, Dr. Ficker asked Dr. Gainous by letter if Mr. Jarrells' salary could be raised to make it even with the salaries of the other two Campus Directors. Dr. Gainous responded affirmatively, and the change was made. Mr. Woods became upset. He argues that this upgrading was done clandestinely, but this court does not find that there was anything hidden or secretive about it. It was the published salary differential between Messrs. Woods and Jarrells which provided the impetus for Mr. Woods' complaint. The difference, if any, between the *prestige* of the jobs held by Messrs. Woods and Jarrells is minimal, except to the extent that salary *equals* prestige. Mr. Woods' complaint is entirely the product of the salary differential. Otherwise, he would have complained much sooner.

Mr. Woods is well qualified to do what he does. Mr. Jarrells is well qualified to do what he does. The two men do not do the same thing. Mr. Jarrells would have a difficult time performing Mr. Woods' actual job, and Mr. Woods would have a difficult time performing Mr. Jarrells' actual job. Mr. Jarrells has substantial "hands on" vocational experience in the workplace.

Mr. Woods totally lacks such experience. Mr. Woods has never taught a vocational class. Mr. Jarrells has had years of vocational teaching experience. If the job of Campus Director at the "technical campus" did not call for the "know-how" to be Technical Dean, so as to suggest that the Campus Director at the "technical campus" is the proper person to serve on the Board of The Bevill Center, a local vocational training facility, as Gadsden State's representative, Mr. Woods might be competitive with Mr. Jarrells for Campus Director. Mr. Woods is intelligent and articulate, but the position of Campus Director at the "technical campus", as it actually functions, requires a person with large vocational teaching experience, and Mr. Jarrells is clearly the better qualified person for the job. Dr. Tipton, who, as previously noted, was called by Mr. Woods as a witness, unequivocally gave his opinion that Mr. Jarrells is better qualified than Mr. Woods for this particular job. Neither Drs. Ficker nor Gainous could perform Mr. Jarrells' actual job as well as Mr. Jarrells is performing it, even though both defendants hold the Ph.D. degree. How the qualifications of Messrs. Jarrells and Whitaker compare must await the trial of Mr. Whitaker's case, except that with Mr. Whitaker's being white he faces a much more serious obstacle than does Mr. Woods.

After this action had been filed, Maceo Howard, Dean of Gadsden State, a black, recommended that Carl Byers, who is also black and who was then employed as a part-time math instructor or tutor, be approved to fill a new full-time math teaching position. At that time, Ann Webb, who is white, complained that the position was being filled without posting. Dr. Ficker and Dean Howard discussed this ticklish situation with Mr. Woods, who as Personnel Officer was an appropriate person to participate in the effort to solve the problem. Mr. Woods vehemently opposed advertising the position and wanted it to be awarded to Mr. Byers without competition, although according to Mr. Byers, Ms. Webb had been at Gadsden State longer than Mr. Byers had. Seniority, of course, was relevant only as between employees who were actual employees at the time of the 1985 merger. They were given preference over outside job applicants after the merger. Neither Mr. Byers nor Ms. Webb was employed in 1985. Mr. Woods took the occasion of the discussion of the Byers–Webb problem to suggest to Dr. Ficker that Gadsden State was racist, an assertion which prompted Dr. Ficker to point out to Mr. Woods the theory of his instant complaint in which he complains of a job opportunity being filled without posting. Over Mr. Woods' strong objection, Dean Howard and Dr. Ficker concluded that the math job should be posted, and after competitive interviews involving both Mr. Byers and Ms. Webb, the position was awarded to Ms. Webb. Mr. Byers is still employed by Gadsden State at a salary level comparable to that of Ms. Webb.

## CONCLUSIONS OF LAW

Based on the above facts found by this court, some undisputed and some having required credibility determinations, the court concludes that neither of these defendants is liable for any violation of *Lee v. Macon*, of Title VII, or of § 1981 in defendants' dealings or relationships with plaintiff. Although Mr. Woods argues that he was demoted as a result of the merger in 1985, he did not appeal from the merger decree and has never collaterally attacked it. Rather, he relies on it. Drs. Ficker and Gainous had nothing to do with Mr. Woods' initial job assignment under the decree. Furthermore, as to any cause of action which arose in 1985, laches has clearly barred it.

*Application of Lee v. Macon and the Merger Decree Creating Gadsden State.*

▮ In his post-trial brief Mr. Woods argues that Drs. Ficker and Gainous violated a 1967 injunction entered in *Lee v. Macon*, 267 F.Supp. 458, 480 (M.D.Ala.1967), wherein the court enjoined the Alabama State Board of Education and all of its agents "from discriminating on the basis of race in the operation or conduct of the public schools of Alabama ..." The merger decree of 1985, which created Gadsden State, and from which no appeal was taken

by the plaintiff class or by any student or employee of Gadsden State, was an elaboration or application of the earlier decrees in *Lee v. Macon* and not a contradiction of them. The underlying truth is that the original injunction of 1967 has since that time evolved into a truism which does no more than reflect the requirements of the civil rights statutes. It should no longer be a substitute for the statutory causes of action or a redundant procedure in every case brought by a school employee. It is for this reason that this court denied Mr. Woods' petition for formal intervention in *Lee v. Macon*, but because the 1985 merger decree is relatively recent, the court deemed it within the realm of reasonableness to anticipate that the 1985 decree might still be a vehicle for resolving employment squabbles arising out of and during the implementation of the merger, a process which may or may not be complete.

Mr. Woods says that this court's 1985 decree has been violated. The court had indulged the fond hope that it would not be too frequently called upon to monitor compliance with its decree. Fortunately for all concerned, this has proved to be the case. For reasons previously stated, it was with some reluctance that this court even allowed Mr. Woods to invoke the 1985 decree. Now that the court has carefully reread its 1985 opinion, it can find nothing there which Title VII and § 1981 do not give Mr. Woods. The only reason the 1985 opinion was referred to in *Burns v. Gadsden State, supra,* is that the decree specifically recognized that a then employee of any one of the three institutions being merged should have a preference over newly hired employees. This portion of the 1985 opinion was implicated in *Burns*. It is not here implicated. In the instant case, Messrs. Woods and Jarrells both were employed by one of the former institutions prior to the merger. After the 1985 decree, Messrs. Woods and Jarrells started on an even playing field under the new regime. Although the court allowed Mr. Woods to invoke *Lee v. Macon* as an alternative avenue for relief, in retrospect the court believes that Mr. Woods' claims should have been pursued afresh pursuant to the civil rights statutory scheme, especially inasmuch as the 1985 decree has no direct bearing any of the claims here pursued.

### The Title VII Claim.

Until the trial itself began, there was no reason to suspect that Mr. Woods intended to rely upon a theory of disparate impact. The whole thrust of his complaint from its filing until plaintiff's post-trial brief was disparate treatment. Now Mr. Woods wishes to claim that he is the victim of disparate treatment and/or disparate impact. The court perhaps should not allow an implied amendment of the pre-trial order to permit the belated introduction of a disparate impact theory, but the court will allow the theory because it is not supported by the facts and therefore cannot prejudice defendants by its late presentation.

Before analyzing the case under either a theory of disparate treatment or of disparate impact, the court must, as always, examine its own jurisdiction.

■ Dr. Gainous argues that there is no Title VII jurisdiction as to him because he was not named in the EEOC charge by Mr. Woods. This court made no finding of fact on this subject because this court believes that the EEOC charge provided sufficient warning to Dr. Gainous of a potential claim against him, and because the court believes that such a jurisdictional defect, if it exists, is waivable. There is, however, another defect which is not waivable. That defect appears in *Rogero v. Noone,* 704 F.2d 518 (11th Cir.1983), which remains the law of the Eleventh Circuit. *Rogero* perfectly fits the undisputed procedural facts of this case. Mr. Woods never named Gadsden State as a defendant and never suggested that Gadsden State was a indispensable party. Gadsden State is the only entity that writes Mr. Woods' paycheck and that admittedly has in excess of fifteen employees and thus meets the definition of "employer" contained in 42 U.S.C. § 2000e(b). Neither Drs. Ficker nor Gainous is shown personally to have fifteen employees. Mr. Woods initially did name as defendants the members of the State Board of Education

in their individual capacities, but he did not name the Board itself as a defendant. In a startlingly similar fact situation, the *Rogero* court said:

The sole issue on appeal is whether a suit can stand against the Tax Collector as an agent of Putnam County or as a part of that political subdivision without making the county a party to the action. The district court held that because Noone had fewer than fifteen employees, he was "not an employer within the definition of 42 U.S.C. § 2000e, either individually or as Tax Collector, and thus, the plaintiff's Title VII action against Defendant Noone [could not] be maintained." Record at 44. The parties agree that Noone, in his individual capacity, did not employ a sufficient number of workers to qualify as an "employer" for Title VII purposes. Nonetheless, the appellant argues vigorously that Noone's status should not be so narrowly construed, but that the Tax Collector should be characterized as an agent of Putnam County. Additionally, Rogero urges that she should be permitted to aggregate the total number of Putnam County workers in order to meet the requirement of fifteen or more employees. Logic would dictate, then, that Putnam County is the actual employer and hence, the real party in interest in this case. For whatever reason, however, the county was not made party to this action and that is the omission critical to our decision. We agree with the district court that it is not appropriate to take a headcount of all county employees—strangers to this law suit—in determining whether the sole named defendant meets the jurisdictional requirement of numerosity.

In any event, the appellant insists that Noone, as an agent, is a proper defendant, thereby precluding the necessity of suing the county as well. To support this contention, Rogero relies heaving on *Owens v. Rush*, 636 F.2d 283 (10th Cir. 1980). In *Owens*, the court held that a sheriff who employed fewer than fifteen persons was an agent for the county and therefore an employer for Title VII purposes. The critical distinction between that case and one before us is that in *Owens*, the plaintiff named not only the sheriff, but also the Board of County Commissioners and other political bodies as codefendants. Likewise, in *Vulcan Society v. Fire Department of White Plains*, 82 F.R.D. 379 (S.D.N.Y.1979), which held a district fire commissioner an agent of the city for Title VII purposes, both entities were parties to the suit. By contract, in *Aguilera v. Cook County Merit Board*, 21 F.E.P. 731 (N.D.Ill.1979), the court did permit a Title VII suit against the county Police and Corrections Merit Board even though the county itself was not named in the complaint. That decision appears to be a minority view. The appellant has cited no binding precedent to support her position.

Taken as a whole, Rogero's argument is logically inconsistent. She relies on the agency relationship for purposes of numerosity but denies it, in essence, with respect to liability. Despite the fact that jurisdiction rests on the "borrowed" manpower strength of the county, the appellant has failed to join it as a party and has thus deprived Putnam County of a chance to defend against potential liability. Either the county has a stake in the outcome of this law suit, or it does not. The appellant cannot have it both ways by insisting that Putnam County is indispensable for jurisdictional purposes, but unnecessary for a resolution of the merits.

Although the scope of Title VII should be liberally construed, Congress did place certain limits on the broad sweep of the Act. Had Congress meant to remove all restrictions, the statutory definition of "employer" would not have been limited to legal entities employing fifteen or more persons. We conclude that because the Tax Collector was not an employer within the meaning of the statute, the district court lacked jurisdiction to entertain the appellant's claim.

Therefore, the district court did not err in granting summary judgment to the defendant.

704 F.2d at 520, 521 (footnotes omitted).

If the lesson in *Rogero* is applied in this case, as it must be, neither Drs. Ficker nor

Gainous meets the definition of "employer", and thus neither is subject to suit under Title VII.

Assuming *arguendo* that *Rogero* fails to provide an absolute defense to the Title VII claim, another serious defense must be examined, namely, the defense of "unclean hands" available in all equity cases. Because the Eleventh Circuit has clearly held that Title VII provides only equitable relief, the rules of equity necessarily apply. Other courts which share this view of the Eleventh Circuit have held that a Title VII plaintiff must come to court with "clean hands" if the court is to open its doors. For instance, the United States District Court for the Northern District of Illinois this very year in *Carpenter v. Ford Motor Co.*, 761 F.Supp. 62, 66 (N.D.Ill. 1991), held:

> [T]he plaintiff moves to strike the defendants' second affirmative defense of "unclean hands" as inapplicable to Title VII claims as a matter of law. Plaintiff points out that in a Title VII cause of action, absent direct evidence of a discriminatory animus, the plaintiff must establish a prima facie case, then the burden shifts to the employer to articulate some legitimate, nondiscriminatory reason for its actions. Once the employer meets her burden, the plaintiff is afforded the opportunity to show that the employer's stated reason was pretextual. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 805, 93 S.Ct. 1817, 1825, 36 L.Ed.2d 668 (1973). From this the plaintiff reasons that the affirmative defense of "unclean hands" is inappropriate for all Title VII claims. Indeed, the Seventh Circuit has found that "equitable defenses such as unclean hands may also have more limited play in free-speech cases" and other first amendment cases. *Shondel v. McDermott*, 775 F.2d 859, 869 (7th Cir.1985). However, the Court did not go so far as to say that the doctrine of "unclean hands" should never be allowed as an affirmative defense in Title VII suits. Moreover, at least one court in this circuit has applied the doctrine of unclean hands to bar a plaintiff's Title VII claim. *Women Employed v. Rinella & Rinella*, 468 F.Supp. 1123, 1128 (N.D.Ill.1979) (plaintiff denied equitable relief from sexual discrimination claim where, following her termination, she embarked on a program to harass and embarrass her former employer). Accordingly, we will not strike the defendants' defense of "unclean hands" as inapplicable to Title VII claims.

761 F.Supp. at 66.

The fact that Mr. Woods vigorously advocated the appointment of Mr. Byers, who is a black male, to a full-time teaching post without advertising and without considering any possibly qualified competing white or female applicants, is so contradictory to the position Mr. Woods takes in this case that his two positions cannot be reconciled, and his inconsistency can fairly be described as a bad case of "unclean hands". If not a fatal case, the malady operates as an estoppel. It cannot be "equity" to require Dr. Ficker to face a charge of race discrimination from Mr. Woods after Mr. Woods on the flipside of the coin, while pursuing this action, strenuously advocated a relaxation of the general rule of posting in order to benefit a black over a white. This court is not expressing itself on the question of whether or not Dr. Ficker and Dean Howard were legally correct in refusing to follow Mr. Woods' advice, and that to have followed Mr. Woods' advice would have created a viable Title VII claim by Ms. Webb. That question is not before the court. The court is saying that Mr. Woods' glaring inconsistency stands in the way of his claiming a right to equity.

Assuming *arguendo* that Drs. Ficker and Gainous are proper targets under Title VII, contrary to the teaching of *Rogero*, and contrary to the teaching of *Carpenter*, the court must decide whether Mr. Woods was, in fact, the victim of disparate treatment based on his race. The question of disparate impact will be dealt with *infra*. There is no dispute over the facts that Mr. Woods is black and Mr. Jarrells is white. Mr. Woods did not apply for the position of Campus Director at the "technical campus" when the position first ap-

peared on the organizational chart before Dr. Ficker's arrival, although he knew what the duties were. His reason for not applying was logical. The position, when first filled, did not carry a salary increase. When Mr. Jarrells received the position, it constituted for him no more than a change in title. It involved no change in responsibility or in salary. In fact, the actual responsibilities that go with the position have never changed. Drs. Ficker and Gainous at a considerably later time joined in the decision to upgrade the pay scale of the job in order to bring the salaries of all three Campus Directors into line. Thus, as it turned out, Mr. Jarrells was eventually racheted upward in pay without any prior open bidding or competition for the job. The court finds these convoluted facts impossible to fit into the framework of *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981), for determining whether Mr. Woods made out a *prima facie* case, but the court is willing to assume on the facts that a *prima facie* case was made out. The ultimate and decisive question is not whether the decision-making process here violated the principles of "due process" (because § 1983 was never invoked), but rather whether there was intentional, invidious discrimination by Drs. Ficker and/or Gainous, that is, disparate treatment of a subtle, devious, and more ominous kind traceable to Mr. Woods' race. There may have been a shortfall in public relations by Dr. Ficker, and even in wisdom and fairness, but this court finds no racial motivations in what either Drs. Ficker or Gainous did. The court believes that the legitimate, non-discriminatory reasons for this particular employment decision, as articulated, were not pretextual. The fact that Dr. Gainous is black is, of course, not dispositive on the question of intent, but Dr. Gainous came across as a person who is quite sensitive to the concerns of all black employees of this newly formed institution and, for that matter, to the concerns of all employees of all of the institutions which he oversees. Both he and Dr. Ficker may now wish that Dr. Ficker's predecessor had raised the salary of the Campus

Director position at the "technical campus" when it was created, and that he had advertised the job. Dr. Ficker acknowledged during his testimony that in the future he will be careful to post job openings when he fills even a part-time position, and again when it is upgraded to a full-time position, even if the part-time person is highly qualified and already experienced in the job. But a mistake in human relations does not necessarily constitute a Title VII violation, even when a member of a protected group suffers from that mistake. *Bradington v. I.B.M. Corp.*, 360 F.Supp. 845 (D.C.M.D.1973), *aff'd* 492 F.2d 1240, contains one of the better expressions of this judicial tolerance for errors in judgment in the Title VII context:

> To show intentional discrimination plaintiff must prove that the discriminatory practice was not accidental, inadvertent, or heedless, or that it arises from a mistake.

360 F.Supp. at 853. Mr. Woods' best and most believable argument is that Dr. Ficker's decision was "heedless", but that argument is not enough.

This court can conceive of no job more difficult than running a public institution created by a federal court order unless it is being the federal judge called upon to monitor compliance with his own order. If a school administrator is honestly trying to implement a court order, as Drs. Ficker and Gainous were doing, and they make a decision which the judge, if he were a college administrator, might not have made, the decision nevertheless can be a legitimate, non-discriminatory exercise of judgment and not the product of racial discrimination.

Where a defendant's past discriminatory conduct forms the reason or need for a decree enjoining such conduct, that defendant's faulty but honest attempts to follow the decree may not protect him. *Coca-Cola Co. v. FTC*, 475 F.2d 299, 304 n. 6 (5th Cir.1973), *cert. denied*, 414 U.S. 877, 94 S.Ct. 121, 38 L.Ed.2d 122 (1973). But, neither Drs. Ficker nor Gainous was responsible for the conduct which led to *Lee v. Macon* or to the creation of Gadsden State.

They came along later and cannot be vicariously responsible, or liable on a theory of *respondeat superior,* for prior acts of others. An imperfect decree administered by an imperfect college administrator in an imperfect world, monitored by an imperfect judge, requires not an abdication of responsibility by the judge but a high degree of tolerance by the judge for those whose job it is to make everyday management decisions which come with awesome frequency. College administrators have enough problems without having to spend half their lives in federal court. Simply put, this court finds nothing to convince it that Drs. Ficker or Gainous deliberately manipulated the process for hiring, assigning, or promoting personnel with an intent to favor a white employee over a black employee. The pendency in this court of a separate action brought by a white employee, Mr. Whitaker, claiming that the Campus Director job held by Mr. Jarrells should have been posted, proves, if it proves nothing else, that the job of a college administrator is not an easy one. A college administrator has about the same chance as a federal judge has of making everybody happy.

■ Lastly, the *Mt. Healthy* defense is an absolute defense in this case. *See Mt. Healthy City School D. Bd. of Educ. v. Doyle,* 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977). From the entire evidence, even if all three Campus Director positions had been advertised and if Mr. Woods had applied for the position at the "technical campus" (the latter "if" is problematical), Mr. Jarrells would have been appointed because he is much better qualified for the job than Mr. Woods, assuming that Mr. Woods is even qualified for the job as its occupant actually functions in the job. Had the job been awarded after competitive bidding, as between Messrs. Woods and Jarrells, the choice would have been Mr. Jarrells, not just because the court agrees with Dr. Tipton's comparative evaluation of the two men but because the court saw and listened to both men, just as the committee would have done.

This court finds it difficult, if not impossible, to fit this case into the disparate *impact* mold. Disparate impact is discrimination which results from the routine application of a facially neutral rule. In this case Mr. Woods is complaining not that a facially neutral rule adversely impacted on blacks generally but that the general "posting" rule was not uniformly applied or was misapplied in order to discriminate against blacks. This is a theory of disparate *treatment,* and the court has already concluded that the lack of perfect uniformity in the application of a general rule did not, in this case, rise to the level of intentional discrimination.

*The § 1981 Claim.*

Although *Rogero* does not stand in the way of Mr. Woods' § 1981 claim, nor does the "clean hands" doctrine apply to a § 1981 claim which is a *legal* claim that theoretically might entitle the victim to the punitive damages claimed by Mr. Woods, the other principles applicable to a Title VII claim do apply to the § 1981 claim and lead the court to the same ultimate conclusion, namely, that there was no racial motivation in the decisions here which would constitute a violation of the Congressional guarantee in § 1981 that black citizens shall be afforded the same opportunity as white citizens to contract.

Perhaps the fact that the Eleventh Amendment would protect these defendants from exposure to monetary damages if they were sued in their official capacities explains Mr. Woods' decision to sue them only as individuals, and not as state officials.

*Conclusion.*

Based on the foregoing findings and conclusions, a separate decree will be entered in favor of both defendants.